UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

UNITED STATES OF AMERICA,     )
     )
    Plaintiff,     )     3:15-cr-14-GFVT-REW
     )
V.     )
     )     **OPINION**
ROBERT L. BERTRAM, M.D., *et al.*,     )     **&**
     )     **ORDER**
    Defendants.     )
     )

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Trial by jury is a hallmark of the American justice system. At a time when our nation's founders could agree on little else, they at least collectively emphasized the importance of the jury trial. A man's legal fate should not be decided at the hands of a king, a judge, or some other trained mind, so they thought, but by a group of one's peers.[1] Unsurprisingly, then, they guaranteed the right to a trial by jury for future generations by way of the Sixth Amendment.[2] And to this day, despite increasing criticism, trial by jury remains our nation's method of choice when it comes to seeking a just and true resolution of claims.[3]

In the present case, five men were tried for conspiring to commit, as well as substantively committing, health care fraud, and a jury returned a verdict finding them guilty in part. The five Defendants now seek a judgment of acquittal or, alternatively, a new trial. According to the

---

[1] *See* THE FEDERALIST NO. 83 (Alexander Hamilton) ("The friends and adversaries of the plan of the convention, if they agree on nothing else, concur at least in the value they set upon the trial by jury . . . .").
[2] U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . .").
[3] *See, e.g.*, NEIL VIDMAR & VALERIE P. HANS, AMERICAN JURIES: THE VERDICT 339 (2007) (analyzing recent critiques of the American jury system, researching verdicts, and concluding the American jury remains "a sound decision maker in the majority of both civil and criminal trials").

Defendants, the jury based its verdict on insufficient evidence. *See* Fed. R. Crim. P. 29. Further, they contend the jury's verdict is manifestly unjust. *See* Fed. R. Crim. P. 33. While courts do have the power to take a verdict from a jury when presented with appropriate circumstances, the Court does not find this case to warrant such extraordinary relief. Accordingly, for the reasons that follow, the Court DENIES the Defendants' motions.

## I

Dr. Robert Bertram, Jr., Mr. Wes Bottom, Dr. Robin Peavler, Mr. Brian Walters, and Dr. Bryan Wood were jointly charged in November 2015 with conspiracy to commit health care fraud and substantively committing health care fraud on ninety-nine occasions. [R. 1.] The factual background behind the charges is set forth in the Indictment and numerous prior opinions of this Court. [*See, e.g.*, R. 1; R. 82; R. 178.] But, to summarize, two of the five Defendants Dr. Robin Peavler and Dr. Bryan Wood co-owned a chain of substance abuse treatment clinics headquartered in Danville, Kentucky, known as SelfRefind. As part of the substance abuse treatment taking place at SelfRefind, physicians utilized urine drug testing to check for the presence or absence of illicit substances in patients. Drs. Peavler and Wood also became co-owners and operators of PremierTox, Inc., a clinical laboratory located in Russell Springs, Kentucky, alongside Defendants Wes Bottom, Brian Walters, and Dr. Robert Bertram, Jr.

According to the allegations set forth in the Indictment, Dr. Peavler and Dr. Wood began referring all urine samples from SelfRefind to PremierTox for quantitative drug testing, despite the fact that PremierTox was not yet capable of performing the tests and regardless of whether SelfRefind's initial qualitative drug screens indicated a need for a quantitative confirmation test. The SelfRefind urine samples were transported to freezers at PremierTox, and thousands of urine samples were ultimately stored there. Once the equipment at PremierTox was properly

functioning, PremierTox prioritized the testing of fresh urine samples but still tested and ultimately billed insurance payors for the frozen samples, even if many months had passed since the samples' initial collection.

Based on this activity, the Defendants were charged with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, as well as ninety-nine counts of knowingly and willingly executing a scheme to defraud a health care benefit program in violation of 18 U.S.C. § 1347. Of those ninety-nine counts, thirty-six involved claims submitted to Medicaid and/or Medicare, fifteen involved claims submitted to Bluegrass Family Health, and forty-eight stemmed from claims submitted to Anthem BlueCross BlueShield ("Anthem"). [*See* R. 1 at 10-12.]

Over the course of a two and a half week trial, the Government presented evidence from PremierTox employees; SelfRefind treating physicians, employees, and patients; and expert witnesses. At the conclusion of the Government's case-in-chief, the Defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), but the Court reserved its ruling on the matter. The jury then returned its verdict, which was identical as to each of the five Defendants. [*See* R. 283 *through* R. 287.] The jury acquitted each Defendant of the conspiracy charge and of eighty-two substantive health care fraud counts. However, the jury found each Defendant guilty of seventeen out of the forty-eight total Anthem counts. The seventeen counts of conviction represent urine samples collected on or before February 17, 2011, or samples more than six months old at the time of their testing and billing. [*See* R. 1 at 10-12.]

Following the jury's verdict, the Defendants filed post-trial motions for a judgment of acquittal pursuant to Rule 29, as well as motions for a new trial pursuant to Federal Rule of

Criminal Procedure 33.  After holding oral argument and carefully considering the parties' arguments, the Court upholds the jury's verdict and denies the requests for post-trial relief.

## II

### A

As articulated at the outset, our justice system relies on juries, not judges, to determine guilt or innocence in a particular criminal prosecution.  This practice, though sometimes puzzling, is crucial when it comes to protecting the constitutional rights and liberties of the American people—including the rights and liberties of the five Defendants.[4]  Nevertheless, a judge does have the authority to vacate a jury's finding of guilt if the evidence presented during trial was insufficient under the law to support such a conviction.  The Defendants ask the Court to take this action in their case.

Following the conclusion of the Government's case, the Defendants moved for acquittal and now, following the verdict, they have supplemented their motions in support of acquittal pursuant to Federal Rule of Criminal Procedure 29.  Rule 29 requires this Court to enter a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

When considering a Rule 29 motion based on an alleged insufficiency of the evidence, the Court may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute its judgment for that of the jury.  *See United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).  Instead, the Court views all of the evidence in the light most favorable to the Government, and then it considers whether any rational trier of fact could find the elements of the counts of

---

[4] *See, e.g.*, Letter from Thomas Jefferson to Thomas Paine, *in* 7 THE WRITINGS OF THOMAS JEFFERSON 408 (Albert Ellergy Bergh ed., 1905) ("I consider trial by jury as the *only* anchor ever yet imagined by man, by which a government can be held to the principles of its constitution.") (emphasis added).

conviction beyond a reasonable doubt. *See, e.g.*, *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016); *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003). "In sum, a defendant claiming insufficiency of the evidence bears a very heavy burden." *Callahan*, 801 F.3d at 616 (quoting *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)). Because the Defendants have failed to sustain this burden, the Rule 29 motions are properly denied.

**1**

A review of the trial evidence demonstrates that a rational trier of fact could, indeed, conclude each of the five Defendants were guilty beyond a reasonable doubt of the seventeen counts of conviction. In order to convict the Defendants as they did, the jury was required to find that the Defendants "knowingly devised a scheme or artifice to defraud a health-care benefit program in connection with delivery of or payment for health-care benefits, that they executed the same, and that they did so with an intent to defraud." *United States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015). The circumstantial evidence presented by the United States sufficiently allowed the jury to find so.

**a**

First, the Government introduced a variety of evidence tending to show the five Defendants knowingly devised a scheme to commit health care fraud. *See id.* The trial evidence showed that all five Defendants worked together closely to own and operate PremierTox, sometimes including other employees in their meetings but sometimes meeting and traveling alone as a group of five. [R. 313 at 52; R. 315 at 49; R. 321 at 103, 107-08.] The trial evidence showed that Defendant Wood directed the SelfRefind clinics to implement a pre-checked order form, causing physicians to order confirmation drug tests on all patient urine samples by default. [R. 254 at 33.] The trial evidence showed that the five Defendants arranged for SelfRefind—and

only SelfRefind—urine samples to be frozen and stored in a location nicknamed "the Pee Palace." [R. 254 at 33; R. 320 at 10-14; R. 321 at 100.] And the trial evidence showed that, once PremierTox's equipment was properly functioning, the Defendants directed employees to prioritize testing of the frozen SelfRefind urine samples based on reimbursability. [R. 313 at 25; R. 315 at 41; R. 321 at 109, 119.]

While the Court agrees with the Defendants that this general evidence does lend itself more logically to a conspiracy, rather than substantive, conviction, a rational trier of fact could still consider the evidence and conclude that each of the five Defendants, acting individually, knowingly devised a scheme to commit health care fraud. The jury could have inferred that Dr. Bertram knowingly devised such a scheme by virtue of Kristine Kaiser's testimony that Bertram was one of two Defendants "making most of the decisions for the group of five" early on, as well as the testimony of various witnesses suggesting all five Defendants "were involved in everything" going on at PremierTox. [*See* R. 315 at 49; R. 321 at 103.] The same holds true for Dr. Wood, who was responsible for making the company's early decisions alongside Dr. Bertram. [R. 315 at 49.] Dr. Wood drafted an email to the other four Defendants outlining a plan to gross more than two billion dollars per month, which the jury could have easily equated with devising a scheme to defraud insurers, and he is the one who personally directed use of the pre-checked order form at SelfRefind. [*See* Govt. Exhibit 101C; R. 254 at 33.]

The Government put on less proof about Defendants Peavler, Bottom, and Walters's roles in creating a plan for operating PremierTox. But because so much of the trial testimony indicated all five Defendants were involved in running the company, a rational jury could have inferred that those three Defendants made individual choices to defraud insurers like Anthem. [*See, e.g*., R. 315 at 49 (explaining that all five owners eventually "made every decision" about

how PremierTox operated); R. 321 at 103 (explaining all five owners were "involved in everything," that they "ran the company," and that they met together on a regular basis); R. 255 at 81-82 (noting the five owners were ultimately responsible for making decisions at PremierTox).] This is particularly true for Brian Walters, in light of the testimony elicited from witness Howard Claussen that Walters described PremierTox to him as a "get-rich scheme" that worked. [R. 321 at 53.]

Further, an email sent from Dr. Wood to PremierTox CEO Eric Duncan and copied to the other four Defendants, serves as evidence that all five owners were privy to the knowledge that PremierTox was delaying the testing of any urine samples that were not immediately reimbursable. [*See* Govt. Exhibit 101K (listing Dr. Bertram, Dr. Peavler, Mr. Bottom, and Mr. Walters as recipients).] Drawing all inferences in favor of the Government, a rational jury could conclude that these pieces of circumstantial evidence prove beyond a reasonable doubt that the five Defendants each knowingly devised a scheme to defraud Anthem, or, at least, that they knowingly devised a scheme that was likely to result in defrauding Anthem in this way.

**b**

Next, the Government introduced evidence that allowed a rational jury to find that all five Defendants executed a scheme to defraud Anthem in connection with the delivery of or payment for claims. *See Medlock*, 792 F.3d at 711. The trial evidence suggests that all five Defendants, as members of the Board, directed PremierTox employees to carry out a scheme to bill insurers for tests that they knew were not medically necessary. For example, Allen Sellars testified that the decision to test frozen urine samples "was a directive [the employees] were given by the owners of the organization." [R. 313 at 25.] Billing employee Kristine Kaiser testified that all five Defendants directed her, Lisa Johnson, and Liberty Billing regarding which substances to

test and bill for, and that all five Defendants always had to approve the chargemaster. [R. 315 at 34-36.] Specifically, the five Defendants approved the chargemaster to ensure it contained enough CPT or other billing codes to equal a targeted dollar amount to bill insurers, rather than including only those codes that were medically necessary. [*Id.* at 36.]

A number of emails serve as further proof that each Defendant could be found individually liable for executing a scheme to defraud. The Government introduced evidence that Defendant Bertram told Ms. Kaiser the PremierTox owners wished her to begin pursuing quantitative drug testing, and Defendants Bottom, Wood, and Walters were copied on that email. [*See* Govt. Exhibit 101B.] Although Dr. Peavler was not copied on the message to Ms. Kaiser, he (along with Dr. Bertram, Bottom, and Walters) was a recipient of Dr. Wood's email to Eric Duncan directing Duncan not to test any urine samples that were not reimbursable. [Govt. Exhibit 101K.] In light of this and other evidence, a rational jury could infer that each of the five Defendants executed a scheme to defraud, or that they allowed such a scheme to be executed.

**c**

Finally, the Government introduced evidence from which a rational jury could conclude the five Defendants each had an individual intent to defraud. *See Medlock*, 792 F.3d at 711. A number of witnesses testified about the Defendants' general emphasis on pursuing profits. [R. 321 at 108; R. 321 at 53; R. 313 at 35-36.] While the Defendants correctly point out that becoming rich on its own is not a crime [*see* R. 340 at 10-11], a jury is entitled to infer intent to defraud based on proof of profits. *See United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (citation omitted). And the jury was certainly allowed to do so in this case, where the Government again presented proof on this point as to all five individuals.

As for Wes Bottom, CEO Eric Duncan testified that Bottom explained to him that the five Defendants started PremierTox because they "wanted to make money, lots of money." [R. 321 at 108.] As for Drs. Peavler and Wood, one PremierTox employee testified that Dr. Wood described certain frozen urine samples to Dr. Peavler as "liquid gold." [*See* R. 320 at 21.] Further, Derek Hawkins testified that both Drs. Peavler and Wood told him that SelfRefind was allowing the delayed testing of frozen samples specifically to be able to collect money for the testing, and that "the accountability part really wasn't going to be . . . able to be used correct[ly]." [R. 313 at 35-36.] As for Brian Walters, Howard Claussen testified that Walters described PremierTox to him as a "get-rich scheme" that finally worked. [R. 321 at 53.] As for Dr. Bertram, the Government introduced evidence that he and each of the other Defendants received $600,000.00 in owner distributions between April 2011 and October 2011. [*See* Govt. Exhibits 110A-I; 111A-I; 112A-I; 113A-I; 114A-I.] And Dr. Wood's email to Dr. Bertram, Dr. Peavler, Wes Bottom, and Brian Walters outlining a potential plan to gross more than two billion dollars per month and listing as an overhead cost "jets, vacation homes, philanthropy, usual expenses related to world domination…" could have led a rational jury to infer each of the five Defendants were concerned about profits, above all else. [*See* Govt. Exhibit 101C.]

Furthermore, a number of witnesses testified that they suspected the frozen urine samples would no longer be considered medically necessary for billing purposes, and that they raised these concerns to the Defendants. [R. 313 at 24-25, 35-36; R. 321 at 39-40, 99-102; R. 322 at 41-43.] Just as a jury may infer intent to defraud from proof of profits, a jury may infer intent from proof of knowledge of the alleged wrongful activity. *See Davis*, 490 F.3d at 459. For example, Howard Claussen testified that when Brian Walters told him PremierTox was freezing urine samples, he told Walters that the practice was likely unethical and illegal. Claussen then

testified that, in response, Walters told him to "get with the program." [R. 321 at 40.] Lisa Johnson testified that she raised concerns over freezing urine samples and, specifically, whether testing the frozen urine samples would be deemed medically necessary, to Brian Walters and Dr. Bertram. According to Ms. Johnson, those Defendants dismissed her concerns. [R. 322 at 41-43.] And Allen Sellars testified that he raised concerns regarding the testing of frozen urine samples personally and individually to Dr. Wood and also collectively to Dr. Wood, Dr. Peavler, Dr. Bertram, Wes Bottom, and Brian Walters at a board meeting. [R. 313 at 24-25.] In light of this proof that each of the five Defendants was confronted in at least some way regarding the legality of PremierTox's practices, a rational jury could have inferred that each of the five had the requisite intent to defraud Anthem.

In the end, the Defendants adamantly contend that all of the Government's evidence pertains only to the conspiracy charge and not to the substantive counts of conviction. [*See, e.g.,* R. 338 at 1-2.] But Sixth Circuit precedent makes clear that circumstantial evidence alone is enough to sustain a conviction. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984)). Just because the trial evidence may have related more directly to the conspiracy charge than it did to the seventeen counts of conviction, the Court still views the evidence as circumstantial evidence that was relevant to the substantive counts. A rational jury was free to rely on this circumstantial evidence to return a verdict finding the Defendants guilty. *See Stone*, 748 F.2d at 362 (noting that "circumstantial evidence alone can sustain a guilty verdict" and that such evidence "need not remove every reasonable hypothesis except that of guilt").

In addition to their general argument regarding the sufficiency (or alleged lack thereof) of the trial evidence, the Defendants challenge the notion that they could ever be found guilty of fraud for the delayed testing of frozen urine samples. Specifically, the Defendants rely on a prior Eastern District of Kentucky decision *United States v. Paulus*, No. 15-15-DLB-EBA, 2017 WL 908409 (E.D. Ky. March 7, 2017), to contend that medical necessity is a matter of opinion, not an objective fact that can be proven true or false for purposes of an 18 U.S.C. § 1347 conviction. The Defendants emphasize the testimony of various witnesses that suggests the results of a urine drug test *always* have some value to health care providers, no matter how much time has elapsed between the date the urine sample was collected and the date the test was run. [*See* R. 340 at 8-9 (compiling relevant testimony).] But after careful consideration, the Court finds that this testimony does not prohibit a finding of guilt. Instead, the jury was allowed to make the medical necessity determination it did in this case, and Sixth Circuit precedent supports that proposition.

To begin, the Court addresses certain distinctions between *Paulus* and the present case. The *Paulus* decision is, of course, not binding on this Court. *See, e.g.*, *Liebisch v. Sec'y of Health & Human Servs.*, 21 F.3d 428 (6th Cir. 1994); *Foster v. Am. Fire & Casualty Co.*, 219 F. Supp. 3d 590, 596 (E.D. Ky. 2016). But even if it were, *Paulus* would not compel the Court to adopt the Defendants' argument. *Paulus* and the instant prosecution are similar in that both involve charges of health care fraud under 18 U.S.C. § 1347. Beyond that, the cases are notably distinct from a factual perspective.

In *Paulus*, the jury found a cardiologist guilty of health care fraud based on his performance and subsequent billing for allegedly unnecessary cardiac procedures. Following a lengthy trial, the district court judge determined there was insufficient evidence to sustain the

verdict and granted the defendant's Rule 29 motion. Recognizing that the Sixth Circuit has deemed it "fundamental that a false statement is a factual assertion," the *Paulus* court found that the Government failed to prove Dr. Paulus made any false statements worthy of the jury's fraud conviction. *See* 2017 WL 908409 at *5. Specifically, the *Paulus* court considered whether the degree of stenosis present in Dr. Paulus's patients—a measurement used to justify the allegedly unnecessary cardiac procedures he performed—was "an *objective fact*, which can be false, or a *subjective opinion*, which is not subject to proof or disproof." *Id.* at *6 (emphasis in original). Considering this, the court went on to conclude the Government had failed to prove beyond a reasonable doubt that Dr. Paulus "knowingly and willfully exaggerated the extent of his patients' stenosis in their medical records, for the purpose of defrauding a health care benefit program." *Id.* The trial evidence showed that estimating the degree of stenosis is a very imprecise exercise for health care providers, and expert witnesses varied significantly in their observations and assessments of the appropriate treatment under the circumstances. *Id.* at *7-*9. Accordingly, the court concluded that the expert testimony and angiogram evidence did not permit a rational jury to convict Dr. Paulus of making a false statement, and the court further determined the other circumstantial evidence introduced at trial was, alone, insufficient to sustain the conviction. *Id.* at *9-*16.

      As Dr. Wood points out, the *Paulus* opinion does correctly explain that the health care fraud statutes "do not criminalize subjective medical opinions." *See Paulus*, 2017 WL 908409 at *6; [R. 340 at 3]. And the Court recognizes the case law relied upon in *Paulus* that indicates, at least in the False Claims Act context, that "[e]xpressions of opinion, scientific judgments, or statements as to a conclusion about which reasonable minds may differ cannot be false." *See id.* at *9; *United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983 (10th Cir.

2005)).  Nevertheless, the Court does not read *Paulus* as broadly as the Defendants would like.  The decision does not stand for the proposition that medical necessity in any context should never serve as the basis for a § 1347 conviction.  Instead, the *Paulus* opinion stands for the proposition that a health care provider's stenosis measurement is too subjective to serve as a basis for a health care fraud conviction or, maybe even more likely, that *in Dr. Paulus's particular case* the degree of stenosis at issue was too subjective to serve as the basis for his conviction.  *See United States v. Persaud*, 866 F.3d 371 (6th Cir. 2017) (finding sufficient evidence did exist to support a cardiologist defendant's health care fraud convictions for over-treating his patients in light of their degree of stenosis).

The Court acknowledges that the *Paulus* appeal is pending, and this is, in many ways, a developing area of the law.  But as the *Paulus* author even recognized:

> [I]f every doctor can hide behind the guise of subjective medical judgment, the health care fraud statutes may be rendered useless for prosecuting unnecessary services fraud.  However, that is not what this Court has held.  Every doctor cannot hide behind the guise of subjective medical judgment.  Instead, where the necessity of the service is capable of confirmation or contradiction and the doctor's stated 'opinion' can be proven to be objectively false, that case (if proven beyond a reasonable doubt) can sustain a conviction.

*Paulus*, 2017 WL 908409 at *15.  In the present case, the Government introduced sufficient evidence to allow a rational jury to conclude that the drug tests performed on six (plus) month old frozen urine samples and subsequently billed to Anthem were objectively medically unnecessary.

For example, the expert and physician testimony on the whole suggested that urine drug tests are only medically necessary if they are used in patient care.  Although some witnesses testified that delayed test results, even if significantly delayed, could still retain actual value for patient treatment, witnesses also testified about the specific lack of utility of a number of the

drug tests identified in the Indictment. The Government's expert Dr. Andrea Barthwell opined that forty of the tests were so untimely that they were not used by treating physicians for patient care and were thus rendered medically unnecessary by virtue of the freezing and subsequent testing delay. [R. 259 at 30-77.] A number of SelfRefind physicians testified that certain delayed drug tests were medically unnecessary when it came to their patients' care. [*See, e.g.*, R. 324 at 23-25; R. 317 at 19-32; R. 325 at 15-28.] And Anthem representative Nancy Oser testified that if Anthem knew the SelfRefind physicians were not using the tests for patient care, Anthem would not have paid for the claims. [R. 295 at 10, 21.]

Moreover, decisions issued by the Sixth Circuit Court of Appeals confirm that medical necessity can and have formed the basis for a health care fraud conviction. In *United States v. Hunt*, the Sixth Circuit upheld a defendant physician's § 1347 conviction where the evidence allowed a rational jury to find beyond a reasonable doubt that the defendant "caused bills to be submitted to Medicare and Blue Cross/Blue Shield for . . . tests that had not been determined to be medically necessary." 521 F.3d 636, 645 (6th Cir. 2008). While the defense is quick to point out factual distinctions between *Hunt* and the instant case, *Hunt* on the whole may be summarized as follows: the Sixth Circuit upheld the jury's guilty verdict because the evidence showed that the *Hunt* defendant submitted claims to Medicare and private insurance companies for diagnostic tests that he knew were not medically necessary, or for services that he knew were not used in patient care. [*See* R. 340 at 4]; *Hunt*, 521 F.3d at 645-46. Similarly, in *United States v. Martinez*, the Sixth Circuit upheld a defendant's health care fraud conviction where the evidence showed the defendant fraudulently submitted claims for office visits that lasted only a brief period of time, as well as claims for nerve-block injections that were not indicated based on patients' individual needs. *See* 588 F.3d 301, 315 (6th Cir. 2009). Like *Hunt*, *Martinez* may be

summarized as follows: the Sixth Circuit upheld the jury's guilty verdict because the evidence showed that the defendant submitted claims to insurance companies for services that he knew were not medically necessary, or for services that he knew were not truly used for patient care. *Id.*[5]

Ultimately, the defense tries to distinguish the *Hunt* and *Martinez* decisions by implying that those defendants were convicted because they billed for things they did not do, which is different than the Defendants' case where they actually performed the urine drug screens for which they submitted claims. [*See* R. 340 at 4.] But the Court's perspective is not so limited. *Hunt*, *Martinez*, and the Defendants' case are alike in that, in all three instances, the Government alleged that the relevant defendant(s) submitted claims to insurance companies for payment, despite knowing the services behind those claims were not medically necessary. *Hunt*, 521 F.3d at 645-46; *Martinez*, 588 F.3d at 314-16; [R. 1.] And, in all three instances, the Government put on proof that would allow a rational jury to return a guilty verdict.

While in some cases a medical necessity determination could be too subjective to serve as a false statement for purposes of a § 1347 conviction, this case law demonstrates it is not too subjective in every case. And, in light of the evidence presented by the Government, it is not too subjective in the five Defendants' case. The Court, therefore, denies the requests for acquittal.

**3**

The prosecutors, defense counsel, and the Court alike were all surprised by the jury's verdict in this case. But juries sometimes do this, and it is rarely a reason to disturb the verdict.

---

[5] The parties spent some time at oral argument contesting the relevance of *Medlock v. United States*, 792 F.3d 700 (6th Cir. 2015), to the present situation, and the Court has carefully considered *Medlock* in reaching its conclusions. But the Court notes that *Medlock* is not the only Sixth Circuit case implicating medical necessity and, therefore, it is unnecessary to belabor the factual distinctions between *Medlock* and the Defendants' case. The Court takes *Medlock* for what it is worth, but it does not view *Medlock* as the end-all be-all decision the parties seem to believe it to be.

When a jury does return a surprising or even an inconsistent verdict, "the most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *United States v. Powell*, 469 U.S. 57 at 64-65 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932)). Thus, inconsistent verdicts returned in criminal prosecutions are generally unreviewable, and a defendant's protection against an inconsistent verdict lies primarily in the Court's review of the sufficiency of the evidence. *United States v. Randolph*, 794 F.3d 602, 610 (6th Cir. 2015); *United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010).

There are two limited exceptions to this general rule, but neither applies in this case. The Sixth Circuit has carved out two exceptions for circumstances where (1) a verdict is "marked by such inconsistency as to indicate arbitrariness or irrationality" or where (2) a verdict is "mutually exclusive"—that is, "where a guilty verdict on one count necessarily excludes a finding of guilt on another." *Id.* at 610-11. A number of courts have held that a jury's decision to acquit on conspiracy but to convict on an underlying substantive offense does not require a court to vacate the conviction under the first exception. *See, e.g.*, *Powell*, 469 U.S. 57 (upholding a jury verdict where the defendant was acquitted of conspiracy to possess cocaine but found guilty of using a telephone to facilitate a conspiracy); *Ruiz*, 386 F. App'x 530 (upholding a jury verdict where the defendant was acquitted of conspiracy but convicted of substantively violating the statute at issue). And the present situation is also not one where the jury's verdict is logically impossible, as it would be, for example, if a jury convicted a defendant of both larceny and embezzlement as a result of the same underlying conduct. *See Ruiz*, 386 F. App'x at 533.

While counsel and the Court alike may opine on the jury's thought processes inside the deliberation room, none save the jurors themselves will ever truly know the details. The

Defendants feel the jury's verdict stemmed from its undue reliance on a provision of the Anthem provider agreement explaining that Anthem expects providers to perform tests within twenty-four hours of urine sample collection.  [*See* R. 295 at 12-13.]  But if this were true, why wouldn't the jury convict on one hundred percent of the Anthem claims?  It seems equally as likely that the jury relied on Paragraph 2.10 of the Anthem provider agreement, under which PremierTox was directed to submit claims to Anthem for payment "within one hundred eighty (180) days from the date the Health Services are rendered."[6]  [*See* Govt. Exhibit 1D.]  Alternatively, "the verdict could reflect jury lenity, or even a mistaken acquittal."  *Ruiz*, 386 F. App'x at 533; *see also Powell*, 469 U.S. at 64-65.  In the end, there is no way for the Court or counsel to know, and that is acceptable under the law.  In the words of the late Justice Rehnquist, the Defendants may enjoy the benefit of their acquittals on eighty-three counts of the Indictment but, beyond that, "it is neither irrational nor illogical to require [them] to accept the burden of conviction on the counts on which the jury convicted."  *See Powell*, 469 U.S. at 69.

## B

The Defendants alternatively request a new trial pursuant to Federal Rule of Criminal Procedure 33.  Rule 33 allows the Court to vacate a judgment entered against the Defendants and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 motions are granted "only in the extraordinary circumstance where the evidence preponderates heavily against the verdict."  *See United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citation omitted).  While the Court construes all evidence in the light most favorable to the Government

---

[6] Although the Court reads this provision to indicate Anthem would only reimburse PremierTox for a urine drug test if PremierTox submitted the claim for that test within one hundred eighty days of the date the urine sample was *tested*, the jury might have assumed the provision meant Anthem would only reimburse PremierTox for claims submitted within one hundred eighty days of the date the urine sample was *collected*.  [*See* Govt. Exhibit 1D at ¶¶ 1.19, 2.10.]  This could explain the jury's decision to convict on some, but not all, of the Anthem claims presented in the Indictment.

when analyzing a Rule 29 motion, the Court is allowed to "act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence" when resolving a Rule 33 one. *Id.*; *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

Although Rule 33 allows the Court to vacate a jury's verdict and grant a new trial "if the interest of justice so requires," that phrase is not defined in the Federal Rules of Criminal Procedure or elsewhere in the law. *See United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Nevertheless, the Sixth Circuit has articulated "several recurring themes" that emerge from the body of Rule 33 case law that help guide the Court in reaching its conclusion. Rule 33 may be used to grant a new trial if the jury's verdict is against the manifest weight of the evidence, or if a substantial legal error has occurred. *Id.* "[L]ess clear is whether a district court may grant Rule 33 relief where the verdict is not against the substantial weight of the evidence, and where no reversible error or violation of the defendant's substantial rights has occurred, but where the district court nonetheless believes that 'the interest of justice' requires a new trial." *Id.* at 374. In the five Defendants' case, the Court begins by addressing the alleged substantial legal errors. The Court then evaluates whether a new trial is warranted even where the Rule 29 motions are appropriately denied.

**1**

The Defendants identify a variety of alleged trial errors in support of their motions for a new trial. Upon review, none of the articulated errors warrants the Defendants' requested relief.

**a**

First, the Court did not improperly allow civil liability to be conflated with criminal liability over the course of the trial. Defendant Walters maintains the Court "permitted excessive focus on the defendant's alleged civil breaches of contract" and that the Court wrongfully

allowed the Government "to argue to the jury and to introduce evidence related to PremierTox's purported civil violations in submitting claims that were not payable under the health insurers' contracts." [R. 300 at 14.] Distinguishing civil liability from criminal conduct has been part of Mr. Walters's defense since the early days of this litigation [*see* R. 61 at 8], and although the Court did not take the specific action steps Mr. Walters and the other Defendants may have preferred, the Court did, in fact, take special care to avoid confusing the two types of liability in the eyes of the jury.

For example, the Court forbid the Government from discussing the Defendants' civil settlement as well as any other Kentucky Board of Medical Licensure or administrative proceedings. [R. 247.] And while at times the Government and its witnesses did reference certain civil contractual agreements—such as the provider contract between Anthem and PremierTox discussed by Nancy Oser [*see* R. 295]—the focus of the trial on the whole was the Defendants' alleged intent to criminally defraud health insurers. Unlike in the cases relied upon by Mr. Walters, the Government did not merely "bootstrap" its way to a criminal conviction here based on the Defendants' prior civil offenses. *See, e.g.*, *United States v. White Eagle*, 721 F.3d 1108, 1114-15 (9th Cir. 2013); *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980). Instead, the Government presented evidence tending to prove the elements of conspiracy and of substantive health care fraud.

Likewise, the Defendants' argument that the Court erred in failing to give a requested jury instruction does not warrant a new trial. Sixth Circuit courts consider a district court's refusal to give a particular instruction reversible error only if the instruction is a correct statement of the law, the instruction is not substantially covered by other delivered instructions, and the failure to give the instruction impairs the defendant's theory of the case. *See United*

*States v. Adams*, 583 F.3d 457, 469 (6th Cir. 2009). Jury instructions are reviewed "as a whole to determine if they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision." *United States v. Blackwell*, 459 F.3d 739, 764 (6th Cir. 2006). And whether or not to give a particular instruction is a matter reserved for the district court's discretion. *Adams*, 583 F.3d at 468-69; *United States v. Jones*, 403 F.3d 817, 821 (6th Cir. 2005).

During trial, the Court refused over the Defendants' objections to include the following statements in the jury instructions:

> It is also important to note that this is a criminal case and not a civil case. Whether the defendants violated Medicare/Medicaid/insurance rules is not the issue here as violations of these rules do not violate any criminal law. Likewise, whether those agencies ultimately would pay a claim or seek reimbursement for a claim is not the issue in this case. The issue is whether the defendants knowingly and willfully agreed to defraud these agencies.

[R. 261 at 8.]

> It is also the defendants' position that whether a Medicare, Medicaid or private insurance guideline was violated does not establish that they committed a crime, as these are civil contracts and not criminal statutes.

[R. 273 at 3.]

While these are not necessarily incorrect statements of the law and while the Defendants undoubtedly feel the Court's failure to include these instructions impaired their theory of the case, *see Adams*, 583 F.3d at 469, the Court's instructions on the whole adequately charged the jury on 18 U.S.C. § 1347 criminal liability. The given instructions set out the elements of a § 1347 crime; explained that the Government must prove a "bad purpose either to disobey or disregard the law" for a conviction to lie; made clear that § 1347 liability is only appropriate where a defendant "*intends* to deprive" an insurer of money; and described the good faith defense. [*See* R. 280 at 20, 21 (emphasis added), 23.]

This Court, as a matter of course, instructs the jury with Sixth Circuit Pattern Jury Instructions whenever possible. Accordingly, the Court based the § 1347 instruction given in the Defendants' case off of the Sixth Circuit pattern instruction on that criminal statute, with some minor modifications included at the Defendants' request. [*See id.* at 20-22 ("The health care fraud statute is not intended to criminalize lab owners' judgment calls.").] The Defendants have failed to convince the Court that the Sixth Circuit's pattern § 1347 language failed to "adequately inform the jury of the relevant considerations" or to substantially cover the Defendants' proposed statements, particularly where the instructions repeatedly informed the jury that criminal liability lies only where a defendant acts "voluntarily and intentionally, and not because of mistake or some other innocent reason" or where a defendant acts "with the specific intent to do something the law forbids." *See Blackwell*, 459 F.3d at 764; *Adams*, 583 F.3d at 469; [R. 280 at 21.] "[A]s long as the district court's instructions accurately state the law, a defendant is not entitled to the choice of words he requests." *United States v. Frederick*, 406 F.3d 754, 765 (6th Cir. 2005). Such is the case here, and the Court's failure to give the requested jury instruction does not warrant Rule 33 relief.

**b**

Next, the Court did not err in admitting certain evidence pursuant to Federal Rule of Evidence 801(d)(2)(E), an exception to the hearsay rule for co-conspirator statements. The Defendants argue that "*all* of the evidence demonstrated that while the defendants did join together to form a business, they sought to do so honestly and in good faith." [R. 301 at 8 (emphasis added).] This sweeping statement misstates what occurred during trial.

As the Court noted in its prior order on the issue [*see* R. 296 at 6-9], for an out-of-court statement to be admitted under Rule 801(d)(2)(E), the offering party must establish by a

preponderance of the evidence that (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator's statement was made during the course and in furtherance of the conspiracy. *See, e.g.*, *United States v. Kelsor*, 665 F.3d 684, 692 (6th Cir. 2011). Notably, the standard of proof is far different than the proof beyond a reasonable doubt required to sustain a conviction, and a jury's ultimate acquittal on a conspiracy charge does not render evidence admitted under Rule 801(d)(2)(E) inadmissible. *See United States v. Lacey*, 856 F. Supp. 599, 602 (D. Kan. 1994) ("Each circuit that has confronted this question has held that the acquittal of the declarant of conspiracy does not render the statement inadmissible under the co-conspirator exception.")

While Dr. Wood correctly identifies a piece of evidence that suggests the five Defendants were operating PremierTox "honestly and in good faith" [*see* R. 301 at 8 (citing an August 9, 2011, email from Dr. Peavler regarding business operations)], other evidence of record definitively permitted the Court to find that a conspiracy existed between the five Defendants by a preponderance of the evidence. [*See* discussion at Section II(A)(1), *supra* (detailing evidence regarding the substantive counts of conviction, which could also be relied upon by the jury as evidence of conspiracy.] This alleged error provides no basis for a new trial.

**c**

Neither did the Court commit a substantial legal error with regard to Defense Exhibit U. Dr. Wood maintains the Court erred in not permitting him to personally introduce this exhibit, a September 2009 email message sent by him to his co-Defendants regarding his alleged advice of counsel on the legality of freezing urine samples for delayed testing. Dr. Wood argues the exhibit was admissible pursuant to Federal Rules of Evidence 803(1) and 803(3) as both a present sense impression and to show his state of mind. [R. 301 at 8.]

The applicability and/or relevance of the advice of counsel defense was an ongoing issue during trial, first raised in the pretrial motions *in limine* and still a source of contention for the parties during the Defendants' closing arguments. During trial, the Court permitted other Defendants to introduce the September 2009 email message from Dr. Wood, but it did not allow Dr. Wood to introduce it himself or to discuss it in his closing argument. While the Court does not believe it erred in its evidentiary rulings regarding this exhibit of the parties' other advice of counsel related issue, whether this decision was erroneous under the Federal Rules of Evidence ultimately proves immaterial.

"An erroneous admission of evidence that does not affect the 'substantial rights' of a party is considered harmless, and should be disregarded." *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002). For evidence to have affected the substantial rights of a party, "the error must have been prejudicial" or must "have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). Dr. Wood has not argued that the Court's decision affected his substantial rights, and it is hard for the Court to speculate how it might have, particularly where the desired exhibit was, indeed, admitted into evidence and where the jury returned the exact same verdict against each of the five Defendants.

**d**

Finally, the Defendants' post-verdict attempt to call into question the admissibility of Government witness Nancy Oser's testimony also fails to warrant a new trial. [*See* R. 301 at 7-8.] Dr. Wood argues the Court should not have allowed the Government to introduce testimony from Ms. Oser, the Anthem representative, that Anthem would pay for quantitative drug tests only if they were completed within twenty-four hours of the collection of the urine sample. [*Id.*; *see also* R. 295 at 12-13.] Because all of the other trial witnesses testified to a longer testing

turnaround time, Dr. Wood believes that "[c]learly, the contractual provision was one that Anthem routinely waived" and that Oser's testimony allowed the jury to mistakenly conclude "that making a claim for payment from Anthem on delayed tests violated the law." [R. 301 at 7-8.]

Notably, neither Dr. Wood nor any other Defendant objected to this portion of Ms. Oser's testimony during trial. [*See* R. 295.] And the defense did not cross-examine Ms. Oser on this point. [*Id.* at 23-26.] If the Defendants believed this testimony was problematic, they could have vigorously cross-examined the witness regarding the alleged waiver, and they could have called their own witnesses to testify about the issue. At the very least, they could have sought to preserve an objection previously made if they considered one of their prior objections to be relevant. [*See* R. 340 at 14 (referencing the Defendants' frequent objections to questions about contractual provisions, breach of contract, and civil violations).] The Defendants failed to exercise any of these options, thereby waiving the issue. *See United States v. Bales*, 812 F.2d 1408 (6th Cir. 1987) (quoting *United States v. Mayes*, 512 F.2d 637, 653) ("In the absence of plain and prejudicial error, this Court will not disturb a verdict on the basis of erroneously admitted evidence unless a specific and timely objection was made.").

**2**

In the absence of any substantial legal errors, and where the Government presented sufficient evidence to sustain the jury's verdict, the Court does not believe the interest of justice in this case requires granting the Defendants' requests for a new trial. At oral argument, the Defendants pleaded with the Court to grant a new trial in the event the Court denied the various acquittal motions, arguing the combined issues of this case (namely, the Rule 29 arguments and the alleged trial errors discussed above) warrant Court intervention. But whether to grant or

deny the Defendants' motions for a new trial under Rule 33 is a matter committed to the district court's discretion, and this Court chooses to exercise that discretion by denying the motions. *See, e.g.*, *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010).

The Defendants' fourth alleged trial error exemplifies what the Defendants ask of the Court in this case. Although they did not specifically object to Nancy Oser's testimony during trial, they have now decided that this testimony must have been something the jury mistakenly relied upon in reaching its verdict and so they contest it after the fact. The Defendants essentially want to the Court to delve into the jury's thought processes, to decide the jury erred in its reasoning, to grant a new trial, and to clarify the trial evidence the next time around in order to prevent what they feel was an erroneous verdict in this case.

But our founders did not craft a system in which trained legal minds review every jury verdict, trying to ensure an appropriate result was achieved. And neither did they craft a system where certain particularly complex cases are exempt from the Sixth Amendment. Rather, as British philosopher G.K. Chesterton poignantly put it when describing the jury's role in the Western world:

> Our civilisation has decided, and very justly decided, that determining the guilt or innocence of men is a thing too important to be trusted to trained men. It wishes for light upon that awful matter, it asks men who know no more law than I know, but who can feel the things that I felt in the jury box. When it wants a library catalogued, or the solar system discovered, or any trifle of that kind it uses up its specialists. But when it wishes anything done which is really serious, it collects twelve of the ordinary men standing round.

*See* G.K. CHESTERTON, *The Twelve Men, in* TREMENDOUS TRIFLES (1909). *See also Lee v. United States*, 825 F.3d 311 (6th Cir. 2016), *rev'd on other grounds by Lee v. United States*, 137 S. Ct. 1958 (2017) (quoting same).

Therefore, while the Court does recognize its ability to vacate a jury's verdict where the interest of justice so requires, the Court will do so *only* where the interest of justice so requires, and this is not that case. The parties and the Court might not fully understand the rationale behind the jury's verdict, but the fate of the five Defendants is nevertheless best left to the twelve ordinary men and women who were impaneled, sworn, and charged to unanimously decide the matter. Where the Government presented sufficient evidence to allow a reasonable jury to find as the Defendants' jury did, and where the Defendants have not convinced the Court that any substantial legal errors were committed, the Court finds no reason to usurp the jury's historic function.

### III

Accordingly, for the foregoing reasons, the Court hereby **ORDERS** that the Defendants are not entitled to a judgment of acquittal, nor is a new trial warranted in this case. The jury verdict remains in force, and the Defendants' Rule 29 and Rule 33 motions [R. 267; R. 270; R. 300; R. 301; R. 306] are **DENIED**.

This the 29th day of September, 2017.

Gregory F. Van Tatenhove
United States District Judge